### THE MAGGIE TODD.

(District Court, D. Massachusetts. August 30, 1922.)

#### No. 1558.

Salvage ⌖16, 36—Libelant held entitled to disbursements and fair compensation for use of equipment and services while assisting owners in salvage operations after his abandonment of contract.

Where libelant undertook salvage operations under "no cure no pay" contract, and after unsuccessful effort notified owners that he abandoned his efforts, but kept his equipment and crews at hand, and thereafter assisted owners, who undertook salvage operations on their own account, and who accepted libelant's services, the libelant was not entitled to compensation for services performed prior to abandonment of work under the contract, but was entitled to his actual disbursements subsequent thereto and to fair compensation for the use of his equipment and services while assisting owners, though in excess of compensation provided in contract.

In Admiralty. Libel by Arnetta E. Betts against the schooner Maggie Todd. Decree for libelant.

George L. Dillaway, of Boston, Mass., for libelant.
Russell, Moore & Russell, of Boston, Mass., for claimant.

MORTON, District Judge. The report of the assessor has come in, and from it it appears that in the salvage operations Betts actually expended $2,211.98 in disbursements of various sorts, and also used

⌖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

property of his own, the fair compensation for which would be $1,120, a total of $3,331.98. Of these amounts $705 was expended or accrued before May 10th; the balance, $2,626.98, after that date. Up to May 10th Betts was working under the written agreement on a strictly "no cure no pay" basis. This agreement was made on April 2d, shortly after the Maggie Todd stranded, and it contemplated prompt work by Betts in order to take advantage of the high spring tides. The agreement itself specifically provided that he was to be paid $1,500 if successful, and nothing if he failed, and he was to complete the work within 20 days. He did nothing at all until April 25th, when he put down an anchor and ran a cable to the schooner, and he did not begin work in earnest until about May 4th. He says that this delay was caused by the outbreak of war on April 7th, which made it impossible for him to hire a powerful tug, such as was required. I think, however, that it was due at least as much to the fact that Betts was then engaged in another salvaging operation at Plymouth, where most of his outfit was employed, as to the war, and that he was not able to attend to this matter until the Plymouth job was further advanced.

This delay on the part of Betts made the salvaging of the schooner much more difficult. In the first place, it lost the highest run of tides, and, in the next, the schooner undoubtedly worked farther onto the beach. When Betts began work on her in earnest, about the 4th of May, it was a more difficult undertaking than it had been a month previous, when the contract was signed. He went at the task with skill and resolution, but he was entirely unsuccessful. On May 10th he notified the owners that he abandoned his efforts. Thereupon the owners undertook salvage operations on their own account. Betts kept his equipment and his crews at hand, and worked with them from the sea, while the men hired by the owners worked on the shore. His services were accepted by the owners, who certainly understood that Betts was not working on their vessel for nothing. The schooner was finally hauled off on May 19th and taken to Provincetown. This result would not have been accomplished by the work of Betts alone, nor by the work of the owners alone; it was the result of the combined efforts of both. The expenditure of the owners was about $700. The value of the schooner is agreed to be $7,500.

The present question is how much salvage should be awarded to Betts. For the work done under the agreement before May 10th it seems to me that he is not entitled to any compensation. It was undertaken by him at his own risk under the "no cure no pay" agreement which he abandoned, and I do not think it should be charged directly or indirectly against the owners. Upon abandoning the agreement Betts was free to have taken his equipment back to Boston. He chose not to do so, but to stay by and assist in the salvage operations as a noncontract salvor. Every element leading to large salvage awards is absent; the risk incurred by the salvor was slight; there was neither promptitude nor conspicuous energy displayed in the operation; neither the value of the property saved nor that of the property used in the operations (about $12,000) was large as such things go; the property saved was in no immediate danger of further injury. Betts' con-

duct under the agreement is, to say the least, not such as to predispose the court to favor him.

At the same time, it is to be borne in mind that the schooner as she lay on the beach was a complete loss, and that whatever value she afterwards acquired was the result of the salvage operations. What Betts did appears to have been necessary, and to have been done economically. These considerations bear strongly on the argument by the claimant that the salvage award ought not to be disproportionate to the amount of property saved. The claimant contends that the award should not in any event exceed the contract price. As the contract was terminated on May 10th, it did not thereafter affect the relations of the parties, and the fact that he had made it does not operate to cut down Betts' rights. The claimant has had the benefit of his efforts, and I think should pay a fair price for what he did. The amount called for is large in proportion to the value of the schooner; but there is no evidence that the work could have been done for less, and without it the schooner would have been a total loss.

I therefore allow Betts the amount of his actual disbursements subsequent to May 10th, as found by the assessor, and fair compensation for the use of his tug and lighter after that date, as found by the assessor, a total of $2,626.98.